## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## ROANOKE DIVISION

| | | |
|---|---|---|
| **JACOB DOUGLAS PEYTON IV,** | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 7:16CV00294 |
| | ) | |
| v. | ) | **OPINION AND ORDER** |
| | ) | |
| **JOHN WALRATH, ET AL.,** | ) | By: James P. Jones |
| | ) | United States District Judge |
| Defendants. | ) | |

*Jacob Douglas Peyton IV, Pro Se Plaintiff; Margaret Hoehl O'Shea, Assistant Attorney General, Office of the Attorney General of Virginia, Richmond, Virginia, for Defendants.*

The plaintiff, Jacob Douglas Peyton IV, a Virginia inmate proceeding pro se, sues the Virginia Department of Corrections ("VDOC") and several of its administrators and officials under the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc-1, et seq., and 42 U.S.C. § 1983. After review of the record, I conclude that the defendants' Motion to Dismiss and Motion for Summary Judgment must be granted.

### I.

Peyton has been incarcerated in various VDOC prison facilities since 1977 and has filed multiple prior civil actions in this court. The claims in this case concern various events that occurred during a two-year period when he was confined at River North Correctional Center ("River North").

After Peyton's initial pleading in this case and a subsequent amendment, the court required him to submit a unified pleading to supersede the earlier submissions and stand alone as a full statement of his claims and supporting facts. *See* Order, ECF No. 33. He has done so. Liberally construed, Peyton's Amended Complaint (ECF No. 34) raises the following contentions against the defendants: (1) River North officials improperly confiscated Peyton's religious materials because of his race and Nation of Islam ("NOI") religion; (2) Peyton's VDOC file contains false information that he is an escape risk; (3) some defendants knowingly used this false information to prevent Peyton's transfer to a lower security facility to retaliate against him based on his grievances and religion; (4) because of Peyton's race and religion, some defendants suspended Peyton from attending NOI group religious services after he preached about lawsuits and grievances on August 21, 2015; (5) some defendants suspended NOI religious services in July 2015 for discriminatory or biased purposes; (6) defendants interrupted Peyton's "Black Lives Matter" sermon on July 29, 2016; (7) the Common Fare diet does not adequately accommodate Peyton's religious dietary needs; (8) officials removed Peyton from the Common Fare diet in retaliation for his complaints about administration of the program; and (9) various defendants have improperly rejected Peyton's grievances on these issues. As authority for these contentions, Peyton cites RLUIPA and the First Amendment, and the court also construes his pleadings

as alleging discrimination on the basis of race and religion, a possible equal protection clause under the Fourteenth Amendment. As relief, Peyton seeks compensatory, declaratory, and injunctive relief.

The defendants are the VDOC, VDOC Director Clarke, Regional Administrator Ponton, D. Coffman of Central Classification Services, and the following former or current employees of River North: Warden Walrath, Warden Kanode, Institutional Programs Manger Brian Hall, Staff Administrator R. Sellers, Major M. A. Mullins, Intelligence Officer Burnette (identified in the Amended Complaint as Bernette), Food Service Director J. Morrison, Executive Secretary L. Shumate, Grievance Coordinator B. Walls (originally identified as Walsh), Sgt. Smith, and Correctional Officers Meadows and R. Morgan.

The defendants have filed a Motion to Dismiss all claims against the VDOC and a Motion for Summary Judgment on behalf of the other defendants, supported by affidavits. They argue that some of Peyton's claims must be dismissed because he failed to exhaust administrative remedies and that other claims are without merit. Peyton has responded to the motions, making them ripe for disposition.[1]

---

[1] Peyton has recently filed a "MOTION FOR DISCOVERY; PRODUCTION OF DOCUMENTS," ECF No. 69. As stated, Peyton has already responded to the defendants' motions, and he makes no showing that the discovery he seeks is "essential to justify [his] opposition" to those motions. *See* Fed. R. Civ. P. 56(d). Accordingly, the pending discovery motion presents no basis to defer ruling on the defendants' motions. Moreover, as I conclude that the defendants' motions must be granted and will therefore close the case, I will dismiss Peyton's discovery motion as moot.

II.

A.  Misjoinder of Claims and Defendants.

Peyton is an experienced pro se inmate litigator.  Nevertheless, he has submitted an Amended Complaint that pulls together, in one omnibus civil action, multiple, unrelated claims from different time periods against more than a dozen defendants, in defiance of the federal rules of joinder.  Fed. R. Civ. P. 18, 20; It would be within my discretion to sever the action into multiple civil actions and require Peyton to pay filing costs for all of them before resolving any of his claims.  However, because the case is now ready for resolution, for the sake of judicial efficiency, I will forego severing this case and decide the defendants' motions.

B.  Failure to Exhaust Administrative Remedies.

Under 42 U.S.C. § 1997e(a), a prisoner cannot bring a civil action concerning prison conditions until he has first exhausted available administrative remedies.  This exhaustion requirement is "mandatory." *Ross v. Blake*, 136 S. Ct. 1850, 1856 (2016), and "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002). To comply with § 1997e(a), an inmate must follow each step of the established grievance procedure that the facility provides to prisoners and meet all deadlines within that procedure.  *See Woodford v. Ngo*, 548 U.S. 81, 90-94 (2006).  Even if

the particular form of relief the inmate seeks in his lawsuit is not available through the prison's grievance proceedings, he must, nevertheless, properly exhaust all available remedies under that procedure before bringing a civil action in this court. *Booth v. Churner*, 532 U.S. 731, 741 (2001).

1. VDOC Grievance Procedures.

Operating Procedure ("OP") 866.1 is the written administrative remedies procedure that VDOC inmates must follow to comply with § 1997e(a). Mem. Supp. Mot. Summ. J., Walls Aff. ¶ 4 and Enclosure A, ECF No. 60-2. Section III of this procedure defines a grievance as "[a]n unresolved issue filed and signed by an individual offender on their own behalf concerning an issue which has affected them personally." *Id.* at Walls Aff. Enclosure A. Under OP 866.1, an inmate with a grievance about some event must first make a good faith effort to resolve his concerns informally, usually by completing an Informal Complaint form and submitting it to prison staff. *Id.* at Walls Aff. ¶ 6. He will receive a written response on the bottom of the Informal Complaint form within fifteen days, in order to allow him to initiate the formal grievance procedure by filing a Regular Grievance within thirty days of the occurrence about which it complains. *Id.* After investigation of the Regular Grievance, the warden or his designee will send the inmate a Level I response. *Id.* at ¶ 8. If the responding official determines the grievance to be "unfounded," the inmate must appeal that holding to Level II, the

regional administrator, and in some cases, to Level III. *Id.* "Expiration of the time limit without issuance of a response at any stage of the process automatically qualifies the grievance for appeal." *Id.*

If a Regular Grievance does not meet the filing requirements of OP 866.1, the grievance coordinator will reject the document at intake, mark the reason for the rejection on the back of the form, and return it to the inmate within two days. *Id.* at ¶ 7. The inmate can appeal the intake rejection decision to the regional ombudsman, or he can correct the deficiencies and refile the Regular Grievance. *Id.* Regardless of the inmate's choice at this stage, proper exhaustion requires him at some point to file a Regular Grievance that is accepted at intake and to pursue it through Level I and Level II, and Level III, if applicable. *Id.* at ¶ 8.

An emergency grievance is not a step toward exhaustion of the remedy procedures in OP 866.1. *Id.* at ¶ 9. As the emergency grievance form states, inmates can use such a form to seek "expedited staff responses to allegations that an [inmate] is subject to a substantial risk of imminent sexual abuse and to situations or conditions which may subject the [inmate] to immediate risk of serious personal injury or irreparable harm." *Id.* at Walls Aff. Enclosure C, ECF No. 60-2. After the emergency, to properly exhaust available administrative remedies, the inmate must pursue the normal steps of the Regular Grievance procedure. *Id*. at Walls Aff. ¶ 9.

2. Peyton's Unexhausted Claims.

The defendants argue that Peyton did not properly exhaust available administrative remedies before filing this lawsuit as to Claims (2), (3), (6), (7), (8), and (9). In support of this contention, they present an affidavit from River North Grievance Coordinator B. Walls concerning the remedy forms Peyton has submitted related to each of these claims.

a. Escape Risk Flag.

In April 2016, Peyton believed he was eligible to be transferred from River North, a Security Level 4 ("SL-4") prison, to a SL-3 prison facility and asked his counselor for such a transfer. The Institutional Classification Authority rejected his request for a security level reduction and transfer, however. Peyton learned that in June 2015, the River North administration had flagged him as an escape risk, based on an alleged incident in 1981 in New York. Peyton contends that officials must have known from his VDOC records going back to 1977 that he could not have been in New York in 1981. He alleges that "out of deliberate indifference, reckless disregard, race and religious animus and harassment, they knowingly used the false flag e[s]cape risk information to prevent his transfer to a lower security level facility." Am. Compl. 7, ECF No. 34.

According to Walls's review of grievance records, Peyton submitted a Regular Grievance on May 12, 2016, asking to have false information about an

escape removed from his record. Mem. Supp. Mot. Summ. J., Walls Aff. Enclosure D, ECF No. 60-2. Walls rejected the grievance as a request for services, and this decision was upheld on appeal.

On May 5, 2016, Peyton filed an Informal Complaint asking to have the escape flag expunged from his record. *Id.* at Walls Aff. Enclosure E. This form was received the next day and assigned a tracking number, but Peyton withdrew the request on May 10. Officials do not respond to a withdrawn Informal Complaint, and the inmate is barred from filing any other Informal Complaint on the same issue. *Id.* at Walls Aff. ¶ 13.

Peyton filed a Regular Grievance on June 1, 2016, complaining about allegedly false statements in his prison record that he is an escape risk; wanting to have the matter investigated; asking to have the person responsible relieved of duty; and demanding to have the false statement removed from his record. *Id.* at Walls Aff. Enclosure E. Walls rejected the grievance at intake, because Peyton "had not used the informal process to resolve his complaint and had not submitted an Informal Complaint." *Id.* at Walls Aff. ¶ 14. Walls did not assign the Regular Grievance a number and returned it to Peyton with the reasons for rejection noted on the back of the form. Peyton does not submit evidence that he completed the Regular Grievance procedure and appeal(s) concerning his escape flag claims.

b.  Sermon about "Black Lives Matter."

Peyton submitted a Regular Grievance dated August 24, 2016, complaining that the NOI group service had been interrupted on July 29, 2016, after the Warden and Assistant Warden told Peyton he could not teach "Black Lives Matter" during the service.  Two days later, Walls rejected the grievance at intake.  On the back of the form, he noted that Peyton's grievance was an "[i]nquiry on behalf of other offenders [and] filed on behalf of the NOI."  *Id.* at Walls Aff. Enclosure F.  This rejection decision was upheld on appeal.  Peyton does not submit evidence that he completed the Regular Grievance procedure and appeal(s) concerning his Black Lives Matter claim.

c.  Common Fare Diet.

Because of his NOI affilation, Peyton has participated for years in the VDOC's Common Fare religious diet program that excludes all pork products.  Peyton states that NOI followers are "forbidden to eat or even touch pork."  Am. Compl. 13, ECF No. 34.  Peyton complains that at some point, River North began serving Common Fare meals that included "brown beans, white rice, collard greens, peanut butter, cornbread and other foods forbidden by NOI dietary laws."  *Id.* at 14.  He also complains that on October 28, 2015, River North officials forced him to violate his religious dietary beliefs when they placed "Common Fare food trays on food carts with pork trays," allowed the same workers to handle both types

of trays, and used lids from pork trays to cover Common Fare trays. *Id.* at 13. Peyton contends that when he asked for menu changes to correct these deficiencies, the warden had him suspended from the Common Fare program "as harassment and to silence his complaints."[2] *Id.* at 15.

According to Walls's review of grievance records, Peyton filed a Regular Grievance on June 17, 2015, complaining that the Common Fare meals at River North forced him to eat foods that violated his religious dietary beliefs, making him unable to practice his religion. Mem. Supp. Mot. Summ. J., Walls Aff. Enclosure B, ECF No. 60-2. He asked for changes to the Common Fare program there or for a transfer. The next day, an official rejected the grievance at intake as a request for services, and this rejection decision was upheld on appeal.

Peyton filed an Emergency Grievance on June 6, 2016, at 10:30 a.m. complaining that he had received no response to two request forms he had submitted to Food Service for an NOI tray instead of a Common Fare tray. *Id.* at Walls Aff. Enclosure C. He complained that Common Fare violated his religious beliefs. Lt. Blevins responded at noon, stating that Peyton's submission did not meet the definition of an emergency and that he should submit appropriate paperwork to bring his dietary requests. Peyton does not submit evidence that he

---

[2] The documentation attached to the Amended Complaint indicates that in August 2016, River North officials suspended Peyton from the Common Fare program after a staff member observed him eating food from a regular meal tray. Am. Compl. Ex. 9, ECF No. 34-1. His doing so violated a condition of Common Fare participation.

completed the Regular Grievance procedure and appeal(s) concerning any of his Common Fare diet claims.

d. Officials' Misuse of Grievance Responses.

Peyton asserts throughout his Amended Complaint that various officials rejected his grievances without any justifiable or reasonable basis for doing so. He alleges that officials refused to accept his grievances to harass him or to suppress his right to speak or practice his religious beliefs. These complaints about officers using grievance responses to harass him or violate his rights are also grievable under the VDOC procedures, but Peyton's record does not include "any grievances that staff improperly rejected . . . on the issues in this lawsuit."[3] *Id.* at Walls Aff. ¶ 17.

3. No Showing that Remedies Were Unavailable.

The defendants bear the burden of proving the affirmative defense that Peyton failed to exhaust available administrative remedies regarding his claims before filing suit. *Jones v. Bock*, 549 U.S. 199, 216 (2007). They have done so as to Claims (2), (3), (6), (7), (8), and (9).

---

[3] This claim also fails on the merits. Essentially, Peyton contends that officials' responses at intake denied him access to the Regular Grievance process, a claim soundly rejected in this circuit. *Booker v. S.C. Dep't of Corr.*, 855 F.3d 533, 541 (4th Cir. 2017) ("An inmate [] cannot bring a § 1983 claim alleging denial of a specific grievance process.")

Peyton could yet escape summary judgment under § 1997e(a) if he had stated facts showing that the remedies under the established grievance procedure were not "available" to him. *Ross*, 136 S. Ct. at 1859 (noting that circumstances making prison grievance procedures unavailable "will not often arise"). Generally, "an administrative remedy is not considered to have been available if a prisoner, through no fault of his own, was prevented from availing himself of it." *Moore v. Bennette*, 517 F.3d 717, 725 (4th Cir. 2008).

Peyton does not offer any evidence that remedies were unavailable to him as to any of his unexhausted claims. Instead, he merely disagrees with the reasons given for rejecting his grievances at intake. He argues that grievance officials had "no reasonable bases" to reject his Regular Grievances about the escape flag; the interruption of his NOI sermon on Black Lives Matter; and his complaints about the Common Fare diet. Am. Compl. 6, 12, 14, ECF No. 34. Yet, Peyton states no facts about any efforts he made to correct the noted deficiencies and resubmit his issues in new, properly presented Regular Grievances. For example, he did not attempt to present his escape flag issue in a request for services, as Walls indicated; if officials had denied the request, that denial could then have formed the basis for a new, properly presented Regular Grievance. Peyton also did not rewrite and resubmit his complaint about the interruption of his Black Lives Matter sermon as

a personal grievance detailing the impact the event had on him, rather than as a grievance for NOI inmates as a group.

I find no evidence showing that administrative remedies were unavailable to Peyton on any of the claims that he failed to properly exhaust. Accordingly, I will grant the defendants' motion under § 1997e(a) on the grounds of failure to exhaust available administrative remedies as to Claims (2), (3), (6), (7), (8), and (9). It is clear that Peyton cannot properly exhaust these claims and relitigate them at a later time. Under OP 866.1, any grievance Peyton now filed about the 2015-2016 events at issue in these claims would be rejected as untimely filed. Therefore, I will dismiss his unexhausted claims with prejudice.

The defendants agree that Peyton exhausted administrative remedies as to his other claims. They move for summary judgment on the merits of these claims, alleging unlawful confiscation of religious materials and suspension of NOI group services.

## C. Other Preliminary Matters.

A prisoner's transfer or release from a particular prison moots his claims for injunctive and declaratory relief to correct conditions of confinement there. *See, e.g., Incumaa v. Ozmint*, 507 F.3d 281, 286-87 (4th Cir. 2007) (dismissing former inmate's constitutional challenge to prison mail policy); *Williams v. Griffin*, 952 F.2d 820, 823 (4th Cir. 1991) (holding prisoner transfer mooted requests for

declaratory and injunctive relief).  Since filing his Amended Complaint about conditions at River North, Peyton has been transferred to another VDOC prison. Thus, he is no longer subject to the alleged pattern of racial and religious discrimination at River North that he alleges in his remaining claims.  Accordingly, I conclude that Peyton's claims for injunctive and declaratory relief on these matters must be dismissed as moot.

Some of Peyton's claims for monetary damages also fail at the outset.  The defendants are protected by immunity against damage claims for actions taken in their official capacities.  *See Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989).  Moreover, monetary damages are not available under RLUIPA for any of the defendants' alleged actions.  *See, e.g., Sossamon v. Texas*, 563 U.S. 277, 285-86 (2011) (finding damages not recoverable against defendants in their official capacities under RLUIPA); *Rendelman v. Rouse*, 569 F.3d 182, 189 (4th Cir. 2009) (finding no RLUIPA claim for damages available against defendants in their individual capacities).[4]  Therefore, I will grant summary judgment for the defendants on all claims for monetary damages against the defendants in their official capacities and all claims for monetary damages under RLUIPA.

---

[4]  These cases address the immunity question only as it pertains to RLUIPA as an exercise of congressional spending power, and the statute alternatively invokes congressional commerce power.  *See* 42 U.S.C. § 2000cc-1(b).  I am satisfied that Peyton's Amended Complaint does not present a factual basis for a claim of monetary damages under the Commerce Clause nexus of RLUIPA, however. *See, e.g., Rendelman*, 569 F.3d at 189.

Furthermore, I must grant the Motion to Dismiss the VDOC as a defendant. First, Peyton can have no viable § 1983 claim against the prison, because this state institution is not a person subject to suit under § 1983. *See Will*, 491 U.S. at 65-70. Second, any claim that he may have had against the VDOC for injunctive or declaratory relief under RLUIPA concerning conditions at River North must be dismissed as moot because of his transfer. *Incumaa*, 507 F.3d at 286-87. Third, as discussed, under *Sossamon* and *Rendelman*, he cannot recover monetary damages under RLUIPA against any defendant, including the VDOC.

After disposing of these preliminary matters, there are three claims for monetary damages to address on the merits: Claim (1) concerning confiscation of religious materials; and Claims (4) and (5), concerning suspension of NOI group services. Liberally construing the Amended Complaint, in each of these claims, Peyton alleges violations of his free exercise and free speech rights under the First Amendment and his right to equal protection under the Fourteenth Amendment.

### D. Claim (1): Confiscation of Religious Publications.

1. Factual Background.

After being incarcerated for many years in the VDOC, Peyton was transferred from Red Onion State Prison ("Red Onion"), an SL-5 prison, to River North, a SL-4 prison, in May 2015. During the intake process, officials confiscated the following personal property items transferred with Peyton: ten

Islamic books including his Qur'an, eleven *Final Call* religious newspapers, and a dictionary. Peyton had possessed the Quran and several other books for more than ten years in other VDOC prisons. Officer Morgan returned Peyton's Christian Bible to him, although Peyton alleges that the Bible was in the same condition as his Qur'an.[5]

On May 18, 2015, Property Officer Felts searched and prepared a written inventory of Peyton's personal property items that arrived at River North with him; Peyton was not present for this search. *See* Mem. Supp. Mot. Summ. J., Felts Aff. ¶ 5, ECF No. 60-1. Felts prepared a Notice of Confiscation of Property form, noting several items and reasons that they were not authorized for Peyton to possess at River North, including: sixteen newspapers (in excess of the one newspaper inmates may possess); three books (lacked covers); four books (name marked out or ripped off); three books (falling apart), and two books (homemade covers). Felts noted that the pages of some of Peyton's books were "held together by tape, names and numbers marked out and/or were the name and number of a different offender, names were torn off, and covers were missing or replaced with cardboard." *Id.* at ¶ 7. The items were confiscated under OP 802.1, which

---

[5] Peyton presents photocopies of pages in his Bible covered with handwritten names, addresses, and telephone numbers, some of which have been marked out. Pl.'s Resp. Ex. 1, ECF No. 68-1. Some names appear to list other inmates' identification numbers.

provides that "any state or personal property which has been altered or modified without written authorization is contraband and may be confiscated." *Id.*

Felts states that when he met with Peyton on May 20 to present him with the Notice of Confiscation, Peyton appeared upset and called Felts "a racist because [he] took [Peyton's] Qur'an and left him a Bible." *Id.* at ¶ 8. Felts states, "I did not know what types of books, or the names of the books, that were confiscated . . . because they had been altered and/or modified, and for no other reason." *Id.* Peyton filed grievances about the matter, and prison authorities upheld the confiscation as appropriate under OP 802.1. Ultimately, Peyton consented to send the confiscated religious books to a family member.[6]

2.  Elements of a First Amendment Claim.

"[A] prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." *Pell v. Procunier*, 417 U.S. 817, 822 (1974). This constitutional protection includes the Amendment's "directive that no law shall prohibit the free exercise of religion" or the freedom of speech. *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987).

---

[6] Peyton contends that Morgan, not Felts, issued him the "confiscation forms for the property [Morgan] confiscated" from him. Resp. Mot. Summ. J., Peyton Decl. 13, ECF No. 68-1. Peyton does not, however, deny that the confiscated books had been altered in the manner stated in the defendants' documentation.

Peyton must first prove a substantial burden on the free exercise of his religious practice. *Thomas v. Review Bd. of Ind. Emp't Sec. Div.*, 450 U.S. 707, 717 (1981). Specifically, he must show that the official policy or action "put[] substantial pressure on [him] to modify his behavior and to violate his beliefs." *Id.* at 718. No actionable burden occurs if the official action merely makes the "religious exercise more expensive or difficult," but does not pressure the adherent to violate his or her religious beliefs or abandon one of the precepts of his or her religion. *Living Water Church of God v. Charter Twp. of Meridian*, 258 F. App'x 729, 739 (6th Cir. 2007); *Gordon v. Mullins*, No. 7:12CV00494, 2014 WL 1118199 (W.D. Va. Mar. 20, 2014) (upholding VDOC policy limiting the number of books an inmate can possess in his cell), *aff'd*, 582 F. App'x 248 (4th Cir. 2014) (unpublished), *cert. denied,* 136 S. Ct. 159 (2015).

Moreover, the prison context matters in any constitutional analysis. Because "courts are ill equipped to deal with the increasingly urgent problems of prison administration," they must defer to the expertise of prison officials in crafting policies addressing those problems, such as security, discipline, and efficient use of limited resources. *Turner v. Safley*, 482 U.S. 78, 84, 85 (1987). [7] Thus, even when "a prison regulation impinges on inmates' constitutional rights, the regulation is

_____

[7] I have omitted internal quotation marks, alterations, and citations here and throughout this opinion, unless otherwise noted.

valid if it is reasonably related to legitimate penological interests." *O'Lone*, 482 U.S. at 349.

> This determination of reasonableness turns on a four-factor test:
>
> (1) whether there is a "valid, rational connection" between the prison regulation or action and the interest asserted by the government, or whether this interest is "so remote as to render the policy arbitrary or irrational"; (2) whether "alternative means of exercising the right ... remain open to prison inmates," an inquiry that asks broadly whether inmates were deprived of all forms of religious exercise or whether they were able to participate in other observances of their faith; (3) what impact the desired accommodation would have on security staff, inmates, and the allocation of prison resources; and (4) whether there exist any "obvious, easy alternatives" to the challenged regulation or action, which may suggest that it is "not reasonable, but is [instead] an exaggerated response to prison concerns."

*Lovelace v. Lee*, 472 F.3d 174, 200 (4th Cir. 2006). "[I]n the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment" on matters of prison security. *Turner*, 482 U.S. at 86. The burden of proof "is not on the State to prove the validity of prison regulations but on [Peyton] to disprove it" under the *Turner* factors. *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003).

3. No First Amendment Claims.

Peyton asserts that by declaring his religious materials to be contraband that he could no longer possess, officials unduly burdened his ability to practice and teach his Islamic beliefs. He also mentions "free speech" in connection with this

claim.  Am. Compl. 2, 15, ECF No. 34.  The defendants assert that they are entitled

to summary judgment on Peyton's First Amendment contentions here, and I agree.

Peyton's free exercise claim fails under the first part of the constitutional

analysis.  It is undisputed that Peyton could possess one copy of the Final Call

newspaper in his cell at one time, just not sixteen copies at one time.   And no

prison policy prevented him from obtaining and possessing new, unaltered, and

undamaged copies of the confiscated books to use for his worship and teaching.

No doubt the confiscation caused Peyton some inconvenience and expense; he

could not maintain a file of past newspapers for sermon material and had to borrow

from the library or purchase replacement copies of each confiscated book.  Such

difficulties alone do not qualify as a substantial burden.  *Living Water Church of

God*, 258 F. App'x at 739; *Gordon*, 2014 WL 1118199 at *4 (finding no

substantial burden because property regulation merely "makes it more

inconvenient, difficult, and expensive for Gordon to learn, understand, and practice

Hare Krishna and Islamic doctrine").  I simply find no evidence that the property

policy or the defendants' application of it to confiscate Peyton's materials

significantly pressured him into violating his religious beliefs as required to meet

the substantial burden facet of the free exercise analysis.  *See Thomas*, 450 U.S. at

718.

On the same evidence, I also conclude that the confiscation of Peyton's newspapers and books did not abridge his right to free speech. Officials merely denied Peyton the right to continue his possession of the excess newspapers and the altered books. Nobody banned him from reading the content of the confiscated materials in some other publication that did not violate VDOC property regulations.

Moreover, I conclude that Peyton has not carried his burden to prove under the *Turner* factors that the OP or its application to confiscate his religious publications violated his constitutional rights in any respect. *See Overton*, 539 U.S. at 132 (not the state's burden to prove *Turner* factors). I can easily conceive of legitimate penological interests furthered by limiting the number and condition of publications inmates can possess in their cells. Multiple newspapers in an inmate's cell would take up more space, require more time and effort to inventory or search for contraband, and increase the potential fire hazard. An altered or damaged book also complicates searches. Inmates must purchase books from the commissary or a designated VDOC contract vendor, and each item is searched for contraband upon arrival to the facility. *See* OP 802.1(VI)(A) and (B). If the inmate then alters the item (for example, by writing in it, tearing off its name, or removing part or all of its cover), searching the item requires extra effort to ensure

that it is not stolen, has not been damaged to create or hide contraband items, and does not contain coded messages.

As stated, Peyton had other means to obtain the information in the confiscated publications — from the library or an approved vendor. He could also practice his religious beliefs in other ways through prayer in his cell, his religious diet, and NOI group services. Finally, Peyton has not proposed alternative regulations of inmate property that further the same penological interests in safety and security to the same degree.

Because Peyton has not shown a substantial burden of his free exercise or free speech rights or demonstrated the unreasonableness of the property policy or its application under *Turner*, I will grant the defendants' Motion for Summary Judgment as to his First Amendment contentions in Claim (1).

4. No Equal Protection Claim.

In Claim (1), Peyton asserts: "There were no reasonable or legitimate bases [for prison officials] to allow the Bible and disallow the Holy Quran except for racial, religious or political animus, and retaliation and harassment because of his Islamic religion." Am. Compl. 5, ECF No. 34. He makes similar assertions throughout his pleading. Peyton's discrimination claims arise, if at all, as assertions that the defendants denied him equal protection, in violation of the Fourteenth Amendment.

A conclusory assertion that an act was motivated by race or religious discrimination is insufficient to state a § 1983 claim. *Chapman v. Reynolds*, 378 F. Supp. 1137, 1140 (W.D. Va. 1974). Rather, to prove an equal protection claim, Peyton must first state facts showing that a policy or an official action treated him differently from other inmates with whom he is similarly situated and did so because of intentional discrimination based on his race or his religious views. *Veney v. Wyche*, 293 F.3d 726, 730 (4th Cir. 2002). If he succeeds in making these showings, then he must also show that the disparity in treatment was not reasonably related to any legitimate penological interest, using the *Turner* factors already discussed. *Id.* at 732.

Peyton's equal protection claim fails on the first element of the analysis: he has not demonstrated that officials at River North have confiscated excess or damaged publications under OP 841.3 from other incoming inmates. He admits that he had more newspapers than the policy allowed and that his books had been altered or damaged. Thus, I find no evidence that River North officials treated Peyton differently than inmates with similarly nonconforming publications.

Peyton's discrimination argument focuses on his past possession of the altered publications at Red Onion despite its higher security rating and the return of his altered Bible at River North. These facts, if proven, do not prove that River North staff confiscated Peyton's Muslim publications because of his race or his

religion, rather than because the publications qualified as contraband under OP

841.3.  At the most, these facts show that officials did not always strictly apply OP

841.3 at either prison.  Moreover, I find no evidence that Morgan returned the

altered Bible to Peyton because of Peyton's race or religion, and Morgan's

violation of VDOC policy in doing so is not itself actionable under § 1983.  *See*

*Riccio v. Cty. of Fairfax*, 907 F.2d 1459, 1469 (4th Cir. 1990).  In any event, for

the reasons stated, the policy and its application to Peyton's publications satisfied

the *Turner* factors and, thus, did not violate his equal protection rights.  *Veney*, 293

F.3d at 730.

For the stated reasons, I conclude that Peyton has not alleged facts stating

any actionable equal protection claim against the defendants.  Accordingly, they

are entitled to summary judgment, and I will grant their motion as to Claim (1).[8]

---

[8]    In addition to free speech and race and religious discrimination, Peyton's
Amended Complaint also complains of the defendants' "harassment," "retaliation," and
"political animus" toward him and a "loss of liberty."  Am. Compl. 2, 16, ECF No. 34.  I
do not find any factual support in Peyton's submissions for claims under these legal
labels, and the labels themselves are not sufficient.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678
(2009) ("A pleading that offers labels and conclusions or a formulaic recitation of the
elements of a cause of action will not do.").  For this reason, I do not construe Peyton's
pleading as presenting any possible claims for relief other than the RLUIPA claims and
constitutional claims of free speech, free exercise, and equal protection that I herein
address.  *See Weller v. Dep't of Soc. Servs. for City of Balt.*, 901 F.2d 387 (4th Cir. 1990)
(noting that court obligation for liberal construction of possible claims in pro se pleadings
does not mean court can ignore failure to allege supporting facts).

E.  Claims (4) and (5):  Suspension of NOI Services.

1.  Factual Blackground.

In August 2015, Warden Walrath suspended NOI weekly group religious services at River North for two weeks.  Administrators based the suspension on an Incident Report by Lieutenant Robinson, dated August 4, 2015, that stated:

> On July 31, 2015 at approximately 1:45 PM Officer S. Meadows was working visitation during [NOI] services.  Officer Meadows stated to [Robinson] that the second offender to speak during the services had made certain statements that had [Meadows] concerned.
>
> Officer Meadows stated that the offender speaking made the statement "that the paper work and complaints that they are sending to Richmond is not working, so we need to start pushing back with force.["]  The offenders attending the service started agreeing with the statement made.
>
> Chaplain Anderson also came to me, Lie[u]tenant J.Robinson, and stated that he had problems getting the offenders to start service. He started that they were too busy socializing than conducting their services.

Mem. Supp. Mot. Summ. J., Kanode Aff. Enclosure B, ECF No. 60-3.

The VDOC policy governing inmate religious practices, OP 841.3(IV)(F)(1), states:

> Offenders should have the opportunity to participate in practices of their religious faith, limited only by documentation showing a threat to the safety of persons involved in such activity or that the activity itself disrupts order in the facility.  Some religious activities may be limited, restricted, discontinued, or denied by the Facility Unit Head based upon legitimate concerns regarding security, safety, facility order, space, or resources.

*Id.* at Kanode Aff. Enclosure A. Citing this policy, officials suspended NOI services for a period "due to statements made by NOI speakers [during the July 31, 2015 service] which encouraged violence and/or force directed toward staff." *Id.* at Kanode Aff. ¶ 6.

Peyton denies that the NOI speaker that day, Inmate Debrow, made any statement properly characterized as a threat and submits DeBrow's affidavit. According to DeBrow, on July 31, 2015, the topic for the NOI sermon was the "10.10.15 JUSTICE OR ELSE 20th anniversary gathering of the Million Man March in Washington, DC." Resp. Mot. Summ. J., DeBrow Aff. Ex. 4, ¶ 7, ECF No. 68-1. In honor of this occasion, DeBrow read an article quoting NOI Minister Louis Farrakhan: "When you are seeking justice, you aren't laughing and clowning. When you want justice, you got to have a mind prepared for the 'Or Else', he said. If we are denied what is rightfully due to us, then there has to be unified action that we take that will force that we seek." *Id.* at ¶ 8.

At an NOI group service on August 21, 2015, Peyton conducted a sermon on "'Justice' due to the injustices perpetrated against him and other NOI members" at River North and other VDOC prisons. Am. Compl. 8, ECF No. 34. In this service, Peyton "cautioned the congregation that justice required nonviolent redress of grievances through the established grievance process and law suits in the courts against RNCC and VA DOC." *Id.* Later that same day, Major A. Mullins issued a

written notice to Peyton, stating: "Due to the content of today's [NOI] Service (August 21, 2015), you are hereby suspended from attending for the next 30 days." Mem. Supp. Mot. Summ. J., Kanode Aff. Enclosure C, ECF No. 60-3.

Peyton filed a Regular Grievance about this suspension, complaining that he had only "express[ed his] opinion and beliefs that DOC Muslims at WRCC and RNCC were correct to use the DOC grievance procedure to complain about abridgement of religious rights." *Id*. The Level I response stated that according to grievance investigators, "the content of the material [Peyton was] presenting . . . was enticing and promoting for offenders to sue RNCC, other institutions, and the VADOC . . . had no relation to NOI service material," and was "not permitted" under OP 841.3. *Id*. Peyton now states that on August 21, 2015, he merely informed NOI congregants that inmates at River North and others at Red Onion "filed a lawsuit" about the Common Fare diet. Resp. Mot. Summ. J., Peyton Aff. Ex. 6, ¶ 4, ECF No. 68-1. Peyton maintains that it was his "duty as Coordinator of the N.O.I. to inform its members about the status of a diet that is suppo[s]ed to govern our religious diet." *Id.*

2. No First Amendment Claims.

In response to Peyton's First Amendment arguments in these claims, the defendants assert that Peyton suffered no substantial burden as defined in *Thomas*. 450 U.S. at 718. I agree. Peyton does not present evidence or even allege that

inability to engage in group worship during the temporary suspensions in July and August 2015 forced him to modify his behavior and thereby violate his religious beliefs. Likewise, Peyton does not argue that officials have caused him to violate his religious beliefs through their prohibition of future NOI sermons mentioning lawsuits against prison officials or discussing NOI leaders' call for use of unified action to force staff to comply with their wishes.

Furthermore, the defendants argue that even if the suspensions infringed on Peyton's First Amendment rights, these measures were reasonably related to legitimate penological interests under *Turner*. Again, I agree.

As the defendants contend and OP 841.3 states, the VDOC has legitimate interests in restricting religious activities that disrupt order or raise concerns about security, safety, and allocation of limited space and resources. The VDOC must allocate space and staff to facilitate inmates' group religious meetings as an accommodation of their religious practice. Thus, the VDOC also has legitimate interests "in ensuring that congregate religious services do not fall away from their intended purpose, and become, instead, generalized gatherings for offenders to air social and political grievances." Mem. Supp. Mot. Summ. J. 21, ECF No. 60.

Peyton contends that summary judgment is precluded by a material factual dispute about the contents of DeBrow's statements on July 31 and Peyton's own statements on August 21. According to Peyton's exhibits, DeBrow spoke about

"JUSTICE OR ELSE" and told the NOI worshipers that at Minister Farrakhan's direction, "If we are denied what is rightfully due to us, then there has to be unified action that we take that will *force* that we seek." Resp. Mot. Summ. J., DeBrow Aff., Ex. 4, ¶¶ 7-8, ECF No. 68-1 (emphasis added). I find that officials could reasonably have interpreted these words as advocating inmates' group action against staff and, thus, as creating a risk of disruption or even harm to staff. Such statements implicated OP 841.3's directives authorizing denial of a religious practice that "disrupts order in the facility" or raises "legitimate concerns regarding security, safety, [and] facility order."[9] Mem. Supp. Mot. Summ. J., Kanode Aff. Enclosure A, ECF No. 60-3.

Similarly, I conclude that officials could reasonably have interpreted Peyton's sermon about Common Fare diet lawsuits as inappropriate for the religious meeting. Peyton says he talked approvingly about grievances and past lawsuits against VDOC employees as appropriate and nonviolent ways to seek justice and to inform NOI inmates about the diet. Resp. Mot. Summ. J., Peyton Aff. Ex. 6, ¶ 4. While inmates unquestionably have a constitutional right to petition for redress through lawsuits against prison officials, I find it reasonable for

---

[9] Peyton contends that suspension of the NOI services was not justified because no group demonstration occurred. Under *Turner*'s rational relationship standard, however, prison officials need not wait to see if a reasonably perceived threat becomes reality before implementing policies to prevent it. *See* 482 U.S. at 89 (noting need for court to defer to expertise of prison officials "to anticipate security problems and to adopt innovative solutions to the intractable problems of prison administration").

prison officials to exclude this topic from the subject matter deemed appropriate for inmate gatherings that are expressly provided only as an accommodation of religious practices. Moreover, Peyton could teach NOI diet concerns without reference to past or future lawsuits.

Further applying the *Turner* factors, I find that the specific actions taken under OP 843.1 in this case reasonably furthered VDOC interests in maintaining order and security and efficiently allocating resources. Temporarily suspending NOI services discouraged future socializing during such group meetings and cautioned the group's leaders to avoid discussing topics or reading articles that mention using unified action as means to "force" officials to act. Similarly, Peyton's suspension after his discussion of lawsuits and grievances prevented him from revisiting these subjects in sermons to the NOI group for a month and served as an incentive to focus on religious worship in future NOI services. Finally, Peyton has not proposed any less restrictive alternatives to full suspension that were readily available or furthered the VDOC's interests to the same extent. *See Lovelace*, 472 F.3d at 200 (reviewing *Turner* factors). I conclude that Peyton has not carried his burden to prove that the OP or its application to the NOI services on the two occasions at issue here rose to the level of a constitutional violation under *Turner*. *See Overton*, 539 U.S. at 132. Finding no material dispute on which Peyton could persuade a fact finder to rule in his favor on the First Amendment

contentions in Claims (4) and (5), I will grant the defendants' Motion for Summary Judgment on these claims.

3. No Equal Protection Claims.

Peyton asserts that officials suspended NOI services in July and August 2015, out of "racial [and] religious animus," Am. Compl. 3, ECF No. 34, but fails to present the elements of an equal protection claim. He does not state facts showing that other inmate religious groups of different races had discussed unified action, lawsuits, grievances, or similar nonreligious topics during their religious services without suffering similar consequences. At the most, Peyton offers conclusory allegations that race or religion motivated the suspensions. "A claim of racial discrimination is a grievous charge, which certainly can rise to constitutional dimensions; but absent some factual evidence the court will not look behind the determinations of prison officials on mere accusations that they are racially motivated." *Chapman*, 378 F. Supp. at 1140. Finding no material dispute on which Peyton could persuade a fact finder to rule in his favor on his discrimination contentions in Claims (4) and (5), I will grant the defendants' Motion for Summary Judgment on these claims.

III.

For the reasons stated, I conclude that the defendants are entitled to dismissal or judgment as a matter of law. Accordingly, it is accordingly **ORDERED** as follows:

1. The clerk shall CORRECT the court's docket to reflect the correct spelling of defendant Burnette's name, rather than Bernette; and

2. Peyton's claims for injunctive relief and his discovery motion (ECF No. 69) are DISMISSED as moot; and

3. The defendants' Motion to Dismiss (ECF No. 40) and Motion for Summary Judgment (ECF No. 59) are GRANTED.

A separate Judgment will be entered herewith.

ENTER: September 27, 2017

/s/ James P. Jones
United States District Judge